# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re | Chapter 11 (Involuntary) |
| HOUSTON REGIONAL SPORTS NETWORK, L.P. | Case No. 13-35998 |
| Debtor. | |

## OMNIBUS REPLY OF THE PLAN PROPONENTS TO THE
## OBJECTIONS TO THE APPROVAL OF THE DISCLOSURE STATEMENT

Houston Regional Sports Network, L.P. ("**HRSN**" or the "**Debtor**"), Houston Astros,

LLC, and Rocket Ball, Ltd. (collectively, the "**Proponents**"), hereby file this reply to the

*Comcast Entities' Objection to the Approval of the Disclosure Statement* [D.I. 502] (the

"**Comcast Objection**"); the *Limited Objection to Debtor's Disclosure Statement* [D.I. 504] (the

"**McLane Objection**"); and *Comcast's Supplemental Objection to the Approval of the*

*Disclosure Statement* [D.I. 514] (the "**Supplemental Comcast Objection**," and, together with

the Comcast Objection, and the McLane Objection, the "**Objections**").  The Objections should

be overruled and the Disclosure Statement[1] approved for the following reasons:

## PRELIMINARY STATEMENT

The Disclosure Statement meets every criterion for providing "adequate information" so

that creditors can make an informed judgment and vote to accept or reject the Plan.  Comcast's

objections are without merit, and are inconsistent with Comcast's own statements concerning the

structure and the objective of a chapter 11 plan for the Debtor.  The Plan is wholly in accord with

Comcast's stated purpose of using the chapter 11 process to restructure the Debtor's governance,

to successfully restructure the Network, and make the Debtor profitable by obtaining additional

---

[1] Where the context requires, each capitalized term used but not otherwise defined herein shall have the meaning ascribed to such term in the *Amended Disclosure Statement Relating to the Amended Chapter 11 Plan Dated August 28, 2014 in Respect of Houston Regional Sports Network, L.P.* [D.I. 505].

carriage. With no help from Comcast, and through the contribution of significant value and sacrifice of substantial claims against the Debtor, the teams have negotiated a chapter 11 plan that is manifestly fair, equitable, and confirmable. The Plan is the only viable alternative to liquidation, maximizes available recoveries for the Debtor's stakeholders, triples the Debtor's revenue, nearly doubles the availability of the Debtor's content in the inner-Houston market, and provides Comcast (including Comcast Lender) the recovery to which it is legally entitled.

Indeed, the Debtor's board of directors unanimously voted to seek confirmation of the Plan.  In reaching such decision, the board carefully considered the terms of the Plan and sought the advice of Debtor's counsel.  Not only did the board determine that the plan was viable, but it also correctly noted that it was the only proposal before the Debtor to reorganize its affairs. Further, the board understood that the expiration of exclusivity was imminent unless a plan was filed.  Based on the foregoing, the board unanimously determined that the Plan and the transactions contemplated by the Plan were in the best interests of the Debtor, its estate, and its creditors.[2]

When it commenced this involuntary Chapter 11 Case, Comcast filed a Motion to Appoint a Trustee in which it emphasized that it was willing to make a bid for the Network in the context of a chapter 11 plan, writing: "[Comcast Lender], the Network's secured lender, believes the Network's assets have meaningful value, and would be prepared to make a bid to acquire either the Network (under a plan of reorganization) or substantially all of its assets."  Emergency

---

[2] The Debtor's board considered the available options for reorganizing the Debtor at several meetings over the course of month in which all four directors participated.   On July 2, 2014, the board learned that the teams were considering a potential transaction for reorganizing the Debtor.  Because the proposed purchasers required that their identity and the terms of the transaction not be disclosed to the Comcast Entities, the board executed a unanimous written consent resolving that it was in the best interest of the Debtor that the identities of the proposed purchasers and the terms of the proposed transaction not be disclosed to the Comcast Entities until the earlier of such time as the proposed purchasers deemed appropriate or July 31, 2014.  The board met again on July 22, 2014 and unanimously voted to disclose certain documents to the proposed purchasers in furtherance of their due diligence efforts.  On July 29, 2014, the board unanimously voted to receive the Plan and related materials on a confidential basis so that they could consider the Plan prior to the GP Board's July 31, 2014 meeting.  On July 31, the board unanimously approved the Plan.

Motion of Petitioning Creditors for Appointment of Interim Chapter 11 Trustee [D.I. 3], at ¶ 7. Comcast knew what any reorganization of the Network required: payment of administrative claims; the consent of the teams to assume or amend the Existing Media Rights Agreements; and a feasible business plan.  In fact, in that same motion, Comcast also made it explicit that it was prepared to pay all administrative claims in order to confirm a chapter 11 plan.  Based on Comcast's public statements and the Debtor's representation that all of the Network's third-party creditors would be paid in full, the U.S. Trustee did not appoint an official committee of unsecured creditors.  On January 6, 2014, Comcast reiterated that it "remains prepared to serve as a stalking-horse bidder, and is prepared to acquire the Network, and thus permit the Network successfully to reorganize in bankruptcy."  And, as late as February 25, 2014, Comcast assured the Debtor's board that it was working on a proposal, which it expected to present shortly.

Despite these statements of interest and representations that an offer was imminent, Comcast never submitted a bid to the Debtor.[3]

On March 17, 2014, shortly after this Court entered the order for relief and with no advance notice to the Debtor or the teams, Comcast filed a statement declaring that it was no longer interested in acquiring the Network or its assets.  Comcast publicly stated that it had changed course because of developments "in the nearly six months since this involuntary case was filed."  Comcast's failure to make a bid left the Debtor without an exit from chapter 11 and the Debtor continued to accrue sizable administrative claims, which remain unpaid.

After Comcast abandoned its interest in the Network, the Astros and the Rockets set out to once again aggressively seek proposals from the third-party purchasers and potential carriers whom they had previously engaged in their roles as lead negotiators on behalf of the Network. The teams' renewed efforts ultimately proved fruitful.  On July 2, 2014, the teams reached

---

[3] Instead, Comcast proposed—to the teams alone—only constructs that required the teams to make material amendments to the Existing Media Rights Agreements and did not propose any solutions to the carriage issues that had plagued the Debtor under Comcast's watch for nearly two years.

agreement on the terms of a transaction with AT&T and DTV, the buyers.  On July 30, 2014, the teams, the buyers, and the Debtor finalized the material terms of the Plan.  And, on July 31, 2014, the Network's board unanimously approved the Plan, determining that it was in the best interests of the Network.

With a comprehensive restructuring transaction that will facilitate the Debtor's emergence from chapter 11 on the horizon, Comcast seeks to have the Debtor abandon the only transaction that has been developed and enables a reorganization of the Debtor in favor of an open-ended auction process.  There is, however, nothing in the Bankruptcy Code or applicable law that requires an auction, particularly where, as here, the debtor's primary income-producing assets (on which Comcast Lender does not have a lien) cannot be assumed or assigned without the consent of the teams.  Comcast voluntarily submitted itself to this forum when it commenced the involuntary Chapter 11 Case and it cannot complain about a plan that fully complies with the Bankruptcy Code.

Comcast's other principal confirmation-related objections based on classification, the valuation of the collateral securing its loan, and the absolute priority rule are likewise without merit.  The Plan's classification structure is appropriate and justified by the facts and circumstances of the Chapter 11 Case.  Not only is there a sound business justification for the dissimilar treatment of general unsecured creditors, but the Plan's treatment of those creditors is entirely consistent with what Comcast promised third-party creditors at the outset of this case.  Comcast's next claim, that its collateral is being valued solely on a liquidation basis, is baseless.  As the Amended Disclosure Statement describes in detail, Comcast's collateral will be valued according to its proposed use.  Finally, the teams are not receiving any recoveries on account of their equity interests.  To the contrary, the teams, in their capacities as contract counterparties, are entering into New Media Rights Agreements that include significant and material economic concessions by the teams.

4

The local community has followed this case carefully to determine if and when they will be able to view the Astros' and Rockets' games again.  Fortunately for the Debtor and the local community, the teams took matters into their own hands and found a solution that is consistent with the Bankruptcy Code, will facilitate the Debtor's emergence from chapter 11, and is in the best interest of the Network.  The Objections should be overruled.

## **REPLY**

1.      It is well established that objections directed at a debtor's proposed plan of reorganization should not be considered at a disclosure statement hearing.  *In re Adell*, 325 B.R. 883, 886 (Bankr. D. Fla. 2005) (confirmation issues should be considered at the plan confirmation hearing and not at the disclosure statement hearing); *In re Scioto Valley Mortg. Co*., 88 B.R. 168, 172 (Bankr. S.D. Ohio 1988) (debtor need not obtain the creditors' approval of the plan; it need only provide them with adequate information).  As a result, courts routinely warn against converting disclosure statement hearings into confirmation hearings and are loath to do so.  *See, e.g*., *Adell*, 325 B.R. at 886 (stating that confirmation issues should be considered at the plan confirmation hearing and not at the disclosure statement hearing); *In re U.S. Brass Corp*., 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996); *In re Sunshine Precious Metals, Inc*., 142 B.R. 918, 920 (Bankr. D. Idaho 1992); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y 1988).

2.      Nonetheless, Comcast seeks to do just that by arguing that the Plan is "facially unconfirmable."  In order to prevail on such theory, Comcast must establish that confirmation is "impossible" and that rejection of the plan is a "*fait accompli*."  *See In re Miller*, No. 96-81663, 2008 WL 191256, at *3 (Bankr. W.D. La. Jan. 22, 2008); *In re Allied Gaming Mgmt., Inc*., 209 B.R. 201, 202 (Bankr. W.D. La. 1997).  It cannot do so.  To the contrary, the Plan is clearly confirmable on its face and is the only restructuring option available to the Debtor.  The Plan not only satisfies the requirements of the Bankruptcy Code for confirmation, but, at great cost to the

5

teams, results in a viable network with significantly improved carriage, something Comcast

could not achieve despite its contractual and other obligations to do so.  For these reasons, and,

because it contains adequate information, the Disclosure Statement should be approved.

I.     **THE CLASSIFICATION AND TREATMENT OF GENERAL UNSECURED CREDITORS IS LAWFUL AND APPROPRIATE**

3.     The Comcast Entities assert that the Plan improperly classifies claims, and thus

cannot be confirmed, because (1) it creates a class of Trade Claims; (2) it "hardly impairs" the

holders of Trade Claims; and (3) the class of Unsecured Claims includes "manufactured claims

for . . . unpaid media rights" that were created and classified as Unsecured Claims in order to

have the class vote in favor of the Plan.  None of these claims is now ripe for consideration, and,

regardless, none is valid.

A.     **Objections to Classification and Treatment Should Be Considered at the Confirmation Hearing**

4.     Classification and treatment are legal issues that are typically more appropriate

for consideration at a confirmation hearing than a disclosure statement hearing. *See generally In*

*re Northgate Terrace Aparts., Ltd.*, 126 B.R. 520, 525 (Bankr. S.D. Ohio 1991).  This general

rule is particularly true here because it is unclear whether Comcast will even have standing to

object to these issues with respect to confirmation of the Plan.  Though any party in interest may

object to confirmation of a chapter 11 plan, 11 U.S.C. § 1128(b), a confirmation objection must

relate only to those aspects of a plan that affect the party's interests.  *In re Cypresswood Land*

*Partners, I*, 409 B.R. 396, 418 (Bankr. S.D. Tex. 2009) (citing *In re Quigley Co.*, 391 B.R. 695,

705 (Bankr. S.D.N.Y. 2008)).  The Comcast Entities have repeatedly indicated that Comcast

Lender may make an election under section 1111(b) of the Bankruptcy Code, and the

Bankruptcy Court has extended Comcast Lender's deadline to do so to one week after the

conclusion of the Disclosure Statement Hearing.  Aug. 7, 2014 Hr'g Tr. 21:18-21.  If a

section 1111(b) election is made, the Comcast Lender Deficiency Claim will not exist and the

6

Comcast Entities will have no interest in the issue of classification and treatment of general unsecured creditors. *See In re Quigley Co.*, 391 B.R. at 706 (holding that classification and treatment were "creditor" issues that could be raised by the affected creditors but not noncreditors). At present, then, the Comcast Entities' objections to classification and treatment of general unsecured creditors are, at best, premature and should not be considered by the Court.

### B. The Plan Does Not Gerrymander Trade Claims from Unsecured Claims

5.      Although claims that share common priority and rights against a debtor's estate generally should be placed in the same class of a chapter 11 plan, *Save Our Springs (S.O.S.) Alliance, Inc. v. WSI (II)-COS, L.L.C.* (*In re Save Our Springs Alliance, Inc.*), 632 F.3d 168, 174 (5th Cir. 2011), similar claims may be separately classified for reasons other than to gerrymander a vote. *See Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture* (*In re Greystone III Joint Venture*), 995 F.2d 1274, 1279 (5th Cir. 1991). The Comcast Entities assert that the Bankruptcy Court need not conduct the Confirmation Hearing or consider the testimony of any witness to conclude that the Plan's classification scheme is improper. Comcast Obj., 7-8. This assertion is at odds with both law and fact.

6.      Without citing to any authority, the Comcast Entities incorrectly suggest that separate classification of similarly situated claims is appropriate only when there is a "business necessity." Comcast Obj., 8. The correct standard is that separate classification of similarly situated creditors is appropriate if there are "good business reasons" for such classification. *See Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd., II* (*In re Briscoe Enters., Ltd., II*), 994 F.2d 1160, 1167 (5th Cir. 1993); *In re Greystone III Joint Venture*, 948 F.2d at 140-41. The existence of such reasons is a question of fact. *Id.* at 141 n.7. The record at the Confirmation Hearing will show that there are several good business reasons for the classification.[4]

---

[4] The Comcast Entities also believe that a bad motive for separate classification should be inferred, but the existence of good business reasons for separate classification is an issue of fact and should not be inferred without evidence.

LOS ANGELES 1086959 (2K)

7.      First, the Proponents believe that the "realities of business" and desire for the Reorganized Debtor to "maintain good will for future operations" with trade creditors justify separate classification and different treatment for holders of Trade Claims and holders of Unsecured Claims.  *See In re Greystone III Joint Venture*, 995 F.2d at 1274. *Cf. In re Graphic Commcn's, Inc*., 200 B.R. 143 (Bankr. E.D. Mich. 1996) (approving separate classification of trade creditor and lenders holding unsecured claims because, in part, trade creditors "advance goods and services that the debtor needs to operate").  The Proponents believe that paying holders of Trade Claims in full over the course of time is necessary to ensure that the Reorganized Debtor maintains positive relations with such creditors and to "woo[] [them] to vote for the plan."  *See In re Greystone III Joint Venture*, 995 F.2d at 1274.

8.      Second, separate classification and treatment of Trade Claims and Unsecured Claims is appropriate in light of the different relationships that the holders of such claims have to the Debtor.  Holders of Trade Claims are non-insiders expected to provide ongoing goods, services, or benefits to the Reorganized Debtor on and after the Effective Date, while holders of Unsecured Claims are almost exclusively insiders of the Debtor.  Plan, Ex. A §§ 120, 122. Courts have indicated that a desire to ensure enhanced recovery for non-insider creditors can be an appropriate basis for separate classification.  In *Brinkley v. Chase Manhattan Mortgage & Realty Trust* (*In re LeBlanc*), the Fifth Circuit permitted separate classification of unsecured trade creditors (who were to receive 40% of their claims) and insiders holding unsecured claims (who were to receive nothing on their claims) for a number of reasons, including that the majority of insiders did not object to the classification scheme and that trade creditors were (and insiders were not) essential to the reorganized debtor.  622 F.2d 872, 879 (5th Cir. 1980). Importantly, the appellate court also suggested that an insider's superior knowledge of the risks

---

*Cf. In re Tribune Co.*, 476 B.R. 843, 856 (Bankr. D. Del. 2012) (noting that there was no evidence to indicate that a plan's classification scheme was intended to gerrymander votes).

LOSANGELES 1086959 (2K)

involved in doing business with the debtor, along with the opportunity to protect himself, may justify separate classification of insider claims from those of third-party creditors.  *Id.*; *see also In re Heritage Org., L.L.C*., 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007).

9.      The facts of this case are quite similar to those in *In re LeBlanc*.  The Rockets Entities and the Astros Entities hold the substantial majority of Unsecured Claims and support the Plan's classification and treatment scheme.  Continued positive relationships with the holders of Trade Claims are important to the Network's reorganization.  And, the holders of Unsecured Claims are almost entirely insiders that were uniquely positioned to protect themselves against the risks of bankruptcy.  This is particularly true with respect to the Comcast Entities: not only does Comcast Services provide the Network with management services, but the Comcast Entities were the ones that filed the Petition against the Debtor.

10.      Third, and relatedly, separate classification and treatment of the Trade Claims is appropriate because there has been a universal expectation from the outset of the case that non-insiders would be paid in full.  The Comcast Entities, Rockets Entities, and Astros Entities each gave assurances to this Bankruptcy Court that all non-insider unsecured claims would be paid in full through this Chapter 11 Case.  For instance:

- With respect to the Comcast Entities:

    o On September 28, 2013, in their Trustee Motion, the Comcast Entities stated that they anticipated that prepetition creditors' claims and all reasonably foreseeable administrative expenses would be paid in full.

    o On October 24, 2013, in a pleading filed with the Bankruptcy Court, they indicated that they anticipated that an acquisition of the Network as part of a sale process "would likely lead to full payment of creditors' claims."

    o On October 28, 2013, Robert S. Pick, Senior Vice President of Corporate Development of Comcast, testified that Comcast Lender was prepared to bid for the Network and that the Comcast Entities believed their bid would be "sufficient to pay all prepetition claims, administrative expenses and return a significant amount of equity to the partners."

o On January 6, 2014, Mr. Pick wrote to Tad Brown, Chief Executive Officer of Rocket Ball, that the Comcast Entities were willing to provide a stalking horse bid for the Network at a price that would generally satisfy in full all prepetition secured, administrative, priority and general unsecured claims, including the amounts necessary to cure existing defaults under the Existing Media Rights Agreements.

- With respect to the Rocket Entities:

    o On October 21, 2013, the Rockets Entities filed a pleading with the Bankruptcy Court in which they stated that they believed that the chapter 11 process would provide the best means of assuring full payment of creditors.

    o On January 31, 2014, the Rockets Entities filed a pleading with the Bankruptcy Court in which they repeated their belief that the chapter 11 process would provide the best means of assuring full payment of creditors.

- With respect to the Astros Entities:

    o On September 30, 2013, the Astros Entities' General Counsel wrote to the Debtor's General Manager that the Astros Member was prepared to backstop the payments of the prepetition claims of third-party creditors listed on the Company's accounts payable report dated as of September 24, 2013 that were not affiliates, subsidiaries, or otherwise related to the Directors.

    o On October 10, 2013, the Astros Entities noted in a pleading filed with the Bankruptcy Court that they agreed to backstop valid prepetition claims of third-party creditors.

11.     Those statements were relied upon by key constituents in this case. Most notably, the U. S. Trustee elected not to appoint an official committee of unsecured creditors because of assurances from the Network and its partners of their expectation that non-insiders would be paid in full. Honoring those commitments is an appropriate justification for separate classification and treatment of certain general unsecured claims, as this result could not be achieved if all general unsecured claims were classified together.

12.     Fourth, with respect to classification of the Comcast Lender Deficiency Claim as an Unsecured Claim, the Comcast Entities are tainted by non-creditor interests that might motivate them to vote against the Plan. The Fifth Circuit has acknowledged that separate classification is appropriate where non-creditor interests might motivate a creditor to vote against

10

a plan.  *See In re Save Our Springs Alliance, Inc*., 632 F.3d at 174 (indicating that non-creditor interests including desire to cause dissolution to prevent further litigation unrelated to creditor's claim may be grounds for separate classification).  For instance, separate classification may be appropriate where the separately classified creditor "has a different stake in the future viability of the reorganized company" than that of a mere creditor.  *See In re Premier Network Servs., Inc*., 333 B.R. 130, 135 (Bankr. N.D. Tex. 2005).

13.     Fifth, pursuant to the Investment Agreement, AT&T and DTV required the Astros Entities and Rockets Entities to commit to contributing Cash to the Disbursing Agent to the extent necessary to satisfy certain claims, including the Trade Claims which must be satisfied to facilitate the Reorganized Debtor's go-forward operations.  Courts have acknowledged that separate classification may be appropriate where a claim is to be satisfied by a non-debtor source.  *See generally In re Loop 76, LLC*, 442 B.R. 713, 717 (Bankr. D. Ariz. 2010) (recognizing that it may be permissible for "a bankruptcy court to find, as a matter of fact, that a non-debtor source of repayment of a claim renders it dissimilar from other claims lacking such a source of repayment outside of the plan").

### C. The Holders of Trade Claims Are Not Artificially Impaired, and Even if They Were, Artificial Impairment Is Permitted Within the Fifth Circuit

14.     The Comcast Entities complain that the Plan "hardly impairs at all" the holders of Trade Claims.  However, the Fifth Circuit does not recognize "artificial impairment" as an independent basis for objecting to confirmation of a chapter 11 plan.  In *Western Real Estate Equities, L.L.C. v. Village at Camp Bowie I, L.P.* (*In re Village at Camp Bowie I, L.P*.), the Fifth Circuit held that objections related to artificial impairment should be evaluated under section 1129(a)(3) of the Bankruptcy Code and that artificial impairment did not constitute bad faith as a matter of law.  710 F.3d 239, 247-48 (5th Cir. 2013).  Applying this rule, the appellate court held that it could not conclude that the bankruptcy court erred in finding good faith where a plan that

11

relied upon a minimally impaired class of independent third-parties that extended prepetition credit in the ordinary course of business was proposed for legitimate purposes of reorganizing debts, continuing a venture, and preserving equity. *Id.* The logic of that decision is applicable here; nowhere do the Comcast Entities claim that the Plan was proposed in bad faith, and allegations that the Trade Claims are artificially impaired are not only false,[5] they are irrelevant because the Plan has been proposed for legitimate purposes of restructuring the Network's debts, continuing the Network's operations, and creating going concern value.

### D. Rejection Damages Are Not Manufactured or Classified Improperly

15.     The Comcast Entities also complain that Rocket Ball and Astros, LLC manufactured claims for rejection damages relating to the rejection of the Existing Media Rights Agreements in order to have claims that would flood and control Class 5 for voting purposes. This argument fails for at least two reasons.  Most importantly, the rejection damages claims are not manufactured or any "gimmick."  Rocket Ball and Astros, LLC are owed approximately $131 million in unpaid media rights payments, which the Debtor cannot cure.  Unable to cure those monetary defaults, the Debtor cannot assume the Existing Media Rights Agreements and must reject them.  By operation of section 365 of the Bankruptcy Code, Rocket Ball and Astros, LLC are entitled to rejection damage claims.  Moreover, those rejection claims are substantial— at least $161 million on a present value basis.

16.     Importantly, the Comcast Entities are mistaken in asserting that the terms of the New Media Rights Agreements will be "essentially the same" as those in the Existing Media Rights Agreements.  Comcast Obj., 8.  In fact, the New Media Rights Agreements include material economic concessions including reduced annual payment escalators and additional termination rights for the Reorganized Debtor upon an increase in media rights fees in

---

[5] Though the holders of Trade Claims are paid in full over time, their impairment is economically motivated due to the Network's limited cash balance and the Teams' backstopping of the distributions to such creditors.

connection with certain payment reset provisions.  There can be no genuine dispute that the New Media Rights Agreements are worse for the teams and that they are not the same as the Existing Media Rights Agreements.

17.     Further, Comcast's argument ignores the fact that the Plan can be confirmed even if Class 5 rejects the Plan.

18.     The proposed treatment of the Existing Media Rights Agreements is quite *unlike* the executory contracts that the debtor sought to reject in *In re One Times Square Associates Ltd. Partnership*.  159 B.R. 695, 704-05 (Bankr. S.D.N.Y. 1993), *aff'd*, 41 F.3d 1502 (2d Cir. 1994).  There, the rejection damages claims were placed in a separate class in order to receive preferential treatment.  *Id.*  Here, the teams' rejection damages claims are placed in a class with other general unsecured claims, including the Comcast Lender Deficiency Claim, and will receive, according to the Comcast Entities, "essentially nothing."  Comcast Obj., 7.  Further, the rejection damages claims in *In re One Times Square* were held by third-parties whose votes in favor of the plan were necessary to make the proposed plan confirmable.  *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. at 704-05.  The Plan here does not suffer the same defect, since the claims relating to the Existing Media Rights Agreements will be held by insiders.  *See* 11 U.S.C. § 1129(a)(10).

## II.     THE PROPONENTS' DISCLOSURE OF THEIR VALUATION METHODOLOGY IS APPROPRIATE

19.     The Comcast Entities complain that the Proponents' supplement to the Disclosure Statement says "literally nothing at all" and does not provide even "the most rudimentary" information as to how the value of Comcast Lender's collateral was derived.  Comcast Supp. Obj. 3, 6.  To the contrary, the Proponents believe the Disclosure Statement contains more than sufficient disclosure of the Proponents' valuation methodology and is entirely consistent with the Court's August 7 Order.  [D.I. 475].  And the Comcast Entities will receive the balance of the

LOS ANGELES 1086959 (2K)

information they are seeking in accordance with the Scheduling Order they negotiated and agreed to.

20.     The Disclosure Statement provides a complete road map to Comcast Lender of the methodology, basis, and detail supporting the Proponents' valuation of the Comcast Lender Secured Claim.  As explained in the Disclosure Statement:

- A secured creditor's security interest extends to a debtor's total enterprise value only where that creditor has a lien on all or substantially all of the debtor's primary, income-producing assets and the debtor is proposing to continue to use the secured creditor's collateral to operate its business.

- Where, as here, a secured creditor does not have a lien on substantially all of the debtor's primary, income-producing assets, the secured creditor is not entitled to the benefit of the debtor's total enterprise value when valuing its collateral.

- Comcast Lender does not have a security interest in the majority of the income-producing assets of the Reorganized Debtor.  Comcast Lender does possess a security interest in the Existing Media Rights Agreements, but those will be rejected on the Confirmation Date.  Indeed, Comcast Lender abandoned its security interest in the Existing Media Rights Agreements by refusing to fund its collateral by making ongoing media rights payments.  It also does not have a security interest in the media rights of the teams generally, or on the New Media Rights Agreements.  And Comcast Lender does not have a lien on the New Affiliation Agreements.

- As a result, Comcast Lender is not entitled to the benefit of the Reorganized Debtor's total enterprise value and any newly created goodwill, but rather only to the benefit of its limited collateral, which must be valued on an asset-by-asset basis in light of its proposed use.

- The Existing Affiliation Agreements and the Debtor's other intangible assets do not have any independent standalone value.  The Existing Affiliation Agreements, by their terms, can be utilized only by a licensee of the teams and have no value without those media rights of the Astros Entities and Rocket Entities.

- Given that a reorganization of the debtor is not possible without significant concessions and contributions made by the teams and that the Existing Affiliation Agreements and the Debtor's other intangible assets cannot otherwise be monetized, the Proponents assert that the valuation of the Existing Affiliation Agreements and the Debtor's other intangible assets should take into consideration these concessions and contributions.

14

21.     As the Disclosure Statement explains, the costs and expenses that have been taken into account in valuing the Existing Affiliation Agreements and the Debtor's other intangible assets include:

- The Astros Entities' agreement to not require payment in full in Cash on the Effective Date of their approximately $58.75 million in principal amount  in Administrative and Priority Claims;

- The Rockets Entities' agreement to not require payment in full in Cash on the Effective Date of their approximately $46 million in principal amount  in Administrative and Priority Claims; and

- Payment by the Rockets Entities and the Astros Entities of $10 million to $15 million in other Administrative Claims and Priority Claims.

22.     The Disclosure Statement then described that after applying these costs and expenses to traditional methodologies, such assets have no or little net value, with an upper range of not more than $6 million.  This detailed explanation provides the rationale for why the Comcast Lender Secured Claim should be valued at not less than $16 million and not more than $23 million.

23.     In short, there is more than ample description of how the value of Comcast Lender's collateral was derived in the Disclosure Statement.  What the Comcast Entities really seek is the granular depths underlying that valuation.  But that is not the purpose of the Disclosure Statement; and all of the relevant parties—the Proponents, the Proposed Purchasers, and the Comcast Entities—have agreed that the Scheduling Order will address these specific issues.  [Docket No. 495].  Specifically, the Scheduling Order requires the filing of the Proponents' and Proposed Purchaser's expert disclosures on September 19, 2014, and the filing Comcast Entities' expert disclosure on September 21, 2014.

24.     Comcast nonetheless suggests that the discovery and confirmation schedule should be extended in order to give them additional time to prepare their valuation expert report after receiving the granular valuation information that they claim is lacking from the Disclosure

15

Statement.   That is unnecessary and inappropriate.  As the Court made clear at the hearing on

August 7, 2014, there is no "secret what that [valuation] fight is about," so the Comcast Entities

could "get started" with its "expert report now."  Aug. 7, 2014 Tr. at 23.  Comcast agreed. *Id.* at

23-24.  And then the Comcast Entities agreed to the discovery schedule that the parties

negotiated and filed with the Court -- one that has the Proponents' expert reports due on

September 19, 2014, and the Comcast Entities' expert reports due on September 21, 2014.  Now

the Comcast Entities seek to push back that schedule and delay the confirmation trial. The

Comcast Entities' tactic became even more clear when they sent over their initial list of

witnesses they want to depose: 20 witnesses; 13 of those are from the buyers, including five from

AT&T's corporate development group one of whom is only a Senior Associate on the team. The

Comcast Entities' effort to stall the confirmation trial should be rejected.

25.     Finally, the Comcast Entities' backdoor attempt to raise issues with the teams'

document responses is misplaced.  As a threshold matter, Comcast's Supplemental Objection to

the Disclosure Statement is not the appropriate vehicle to assert a discovery dispute, even if one

did exist.  If the Comcast Entities want to move to compel, they should file a motion.  In any

event, the Comcast Entities' purported dispute regarding "valuation-related information" from

the time that the "Teams served as 'lead negotiator' on behalf of the Network" is misleading and

should be denied.  If the Comcast Entities seek documents valuing the Network or its assets from

the time the teams served as lead negotiators, the teams informed the Comcast Entities that they

do not have such documents.  To the extent the Comcast Entities seek information related to the

teams' respective discussions regarding carriage or equity investments, those documents are

protected from discovery pursuant to this Court's orders concerning the lead negotiation efforts.

The Comcast Entities' effort to establish "good cause" for these documents—on the basis that

they "bear[] on the valuation of the of the reorganized debtor"—contradicts the very position the

Comcast Entities have taken in response to the teams' requests for documents from the Comcast

16

Entities concerning their discussions with providers regarding carriage.  In response to those

requests, the Comcast Entities have argued that such documents are irrelevant to confirmation

issues, including valuation.  In all events, these disclosure statement pleadings are not the

appropriate means for addressing any discovery disputes that may exist between the teams.

26.     At bottom, the Disclosure Statement must only provide "adequate information" to

holders of impaired claims, including Comcast Lender, to make an informed judgment on the

Plan.  *Matter of Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988).  There can be no

dispute that Comcast Lender is provided with the information necessary to determine whether it

will vote to accept or reject the Plan.  The balance of Comcast's objections will be considered on

the schedule the Proponents, the Proposed Purchasers, and the Comcast Entities agreed to in

connection with the Confirmation Hearing.

## III.     THE PLAN SATISFIES THE BANKRUPTCY CODE'S CRAM DOWN PROVISIONS

### A.  Treatment of the Comcast Lender Secured Claim Is Fair and Equitable

27.     Next, Comcast argues that the Plan is unconfirmable because the treatment of the

Comcast Secured Claim is not fair and equitable.  This objection is clearly an objection to Plan

confirmation that should not be addressed at this time.  In any event, Comcast is wrong.  The

Plan provides for the payment of the Comcast Lender Secured Claim in full and in cash,

immediately upon Allowance.  This treatment clearly satisfies section 1129(b)(2)(A)(iii) of the

Bankruptcy Code, which permits a plan to be "crammed down" upon a secured creditor if such

creditor is provided with the "indubitable equivalent" of its claim.  11 U.S.C.

§ 1129(b)(2)(A)(iii).  Among other things, the Fifth Circuit has expressly noted that the payment

of a secured creditor's claim in full and in cash by definition provides such creditor with the

"indubitable equivalent" of its claim.  *Bank of New York Trust Co. v. Official Unsecured*

*Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 247 (5th Cir. 2009) ("Whatever

uncertainties exist about indubitable equivalent, paying off secured creditors in cash can hardly be improper if the plan accurately reflect[s]the value of [their] collateral.").  A plan, such as the Plan, that provides a secured creditor with a treatment expressly sanctioned by the Fifth Circuit cannot be and is not "facially unconfirmable."

28.      Comcast is correct that the Comcast Lender Secured Claim, if any, may be paid after the Effective Date.  This, however, is not a deferred payment plan entitling Comcast Lender to interest.  It is a consequence of the fact that Comcast Lender's claim is disputed.  Comcast Lender will be paid promptly if and when its claim is Allowed.  *See* Plan, Ex. A, ¶ 96 (defining "Plan Distribution Date" as "the earlier of: (a) the Effective Date or a date that is as soon as reasonably practicable after the Effective Date, if such Claim is then an Allowed Claim; or (b) a date that is as soon as reasonably practicable after the date such Claim becomes Allowed, if not Allowed on the Effective Date").

29.      Importantly, the Disbursing Agent's obligations to Comcast Lender under the Plan are backstopped by the Astros Entities and the Rockets Entities.[6]  *See* Plan, § 7.12 ("If [the Disbursing Agent's] Cash is insufficient to pay [among others, the Allowed Comcast Lender Secured Claim,] asset forth herein, additional Cash shall be contributed to the disbursing Agent By the Astros Entities and the Rockets Entities for the sole purpose of paying such Claims.").  Put simply, upon the occurrence of the Effective Date, Comcast Lender will be paid in full and in cash if and when the Comcast Lender Secured Claim is Allowed.

30.      Comcast further argues that the Plan may leave Comcast Lender without a remedy in the event of non-payment because it is not in privity with the Astros Entities and the Rockets Entities.  This ignores the fact that a confirmed plan "'essentially functions as a contract between the debtor and the other entities affected by the plan.'"  *U.S. Brass Corp. v Travelers Ins. Grp.,*

---

[6] If the Plan becomes effective, the teams will be responsible for paying the Allowed amount of the Comcast Lender Secured Claim.  Of course, the teams are not required to fund the Plan if the Court's valuation of the Comcast Collateral is inconsistent with the teams' proposed valuation.

*Inc.* (*In re U.S. Brass Corp.*), 301 F.3d 296, 307 n.40 (5th Cir. 2002) (quoting 8 Lawrence P.

King *et al.*, Collier on Bankruptcy, ¶ 1142.04[2], at 1142-8 (15th ed. rev. 2001)); *see also In re*

*Cornerstone Prods., Inc.*, 416 B.R. 591, 605 (Bankr. E.D. Tex. 2008) ("It is well settled that a

confirmed plan functions as a contract in its own right.").  The Plan specifically preserves the

rights of parties in interest to "enforce and rights or obligations under the Plan," Plan, § 14.8(a),

and specifically preserves to the Bankruptcy Court jurisdiction to hear any such proceeding,

Plan, § 13.1(vii) (retaining jurisdiction to hear "all controversies, suits, and disputes that may

relate to, impact upon, or arise in connection with . . . the Plan . . . or [its] . . . implementation,

enforcement, or consummation . . . .").  Comcast Lender would enjoy a remedy and a ready

forum to enforce its rights in the entirely hypothetical result of a non-payment on account of any

Allowed Comcast Lender Secured Claim.

      31.    Notwithstanding the foregoing, the Proponents will modify the Plan, and make

corresponding changes to the Disclosure Statement, to provide that, on the Effective Date, the

Reorganized Debtor, and, to the extent necessary, the Astros Entities and the Rockets Entities,

shall pay to the Disbursing Agent, in accordance with Section 7.12 of the Plan, Cash in an

amount equal to the value of the Comcast Lender Collateral, as determined by the Court, to be

held in escrow in favor of Comcast Lender pending resolution of any objections to or requests to

subordinate the Comcast Lender Secured Claim.

      32.    Comcast's argument that it is entitled to credit bid also fails.  The Plan affords fair

and equitable treatment to the Comcast Lender Secured Claim.  That is all that the Bankruptcy

Code requires.  *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. ----, 132 S.

Ct. 2065, 2072 (2012) (noting that "the three clauses of § 1129(b)(2)(A) are connected by the

disjunctive 'or'").  In any event, the only sale taking place pursuant to the Plan is a sale of new

equity interests in the Reorganized Debtor, not the sale of any assets in which Comcast Lender

asserts a security interest.  Finally, Comcast Lender's claim against the Debtor and the extent of

Comcast Lender's liens, if any, are subjects of dispute.  Even if there were an auction for its assets, it would be inappropriate to allow Comcast Lender to credit bid.  *See, e.g.*, *In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 61 (Bankr. D. Del. 2014) (justifying reduction in partially secured lender's credit bid rights based on uncertainty concerning a portion of its claim); *In re Theroux*, 169 B.R. 498, 499 n.3 (Bankr. D.R.I. 1994) (noting that secured creditors do not have an "absolute entitlement to credit bid").

### B.  The Plan Complies with the Absolute Priority Rule

33.     Comcast's contention that the Plan violates the absolute priority rule is meritless. The Plan, on its face, does not violate the absolute priority rule.  The Comcast Lender Secured Claim will be paid in full and in cash; Trade Claims will be paid in full in four equal installments and holders of Unsecured Claims, Subordinated Claims and equity interests will receive distributions in order of priority from the Litigation Trust.  On that basis alone, Comcast's objections to the Disclosure Statement should be rejected.

34.     In any event, Comcast's objection on these grounds is premised on a gross mischaracterization of the Plan.  Comcast claims that the payments that the teams will receive under the New Media Rights Agreements are somehow payments on account of the teams' equity interests in the Debtor.  They are not.  The Reorganized Debtor will make payments to the teams under the New Media Rights Agreements "on account of" the indispensable media rights licenses they will grant to the Reorganized Debtor, not on account of their equity interests.  The Debtor cannot reorganize without the Astros Entities' and Rockets Entities' media rights, and no one, including Comcast, has indicated it is willing to fund the Debtor's assumption of the Existing Media Rights Agreements.  Under these circumstances, the Astros Entities and Rockets Entities are fully entitled to renegotiate their media rights fees with the Debtor and to receive payments on account of those rights.  Such negotiations, and payments, have nothing to do with the teams' status as equity holders.

20

35.     Importantly, Comcast makes no mention of the Astros Entities' and the Rockets Entities' rights as creditors or as owners of the valuable media rights.  Nor does it mention the claims being compromised under the Plan.  The Astros and Rockets are substantial administrative and priority creditors entitled to be paid in full and in cash on the Effective Date.  Yet, the teams will receive no such payments.  The Astros Entities and Rockets Entities are entitled to insist that the Existing Media Rights Agreements be assumed, in full and without change, as a condition for the Debtor using their media rights.  Yet, they are agreeing to enter into the New Media Rights Agreements, which are materially worse for the teams.  Indeed, the teams estimate that the rejection damages owed in respect of the Existing Media Rights Agreements will exceed $161 million on a present value basis.  For Comcast to argue that the teams are receiving recoveries "on account of" their equity interests, when they are not even receiving what they are entitled to receive as creditors, is absurd.

36.     Comcast's suggestion that the Astros Entities and Rockets Entities somehow used their positions as equity holders to cause the Debtor to agree to the New Media Rights Agreements is also absurd on its face.  Comcast Obj., 14-16.  Comcast cites *In re Global Ocean Carriers*, Ltd., 251 B.R. 31, 49 (Bankr. D. Del. 2000), in support of its argument.  There, the court found that the absolute priority rule had been violated because equity "controlled" the Debtor.  Comcast Obj., 15 (quoting *Global Ocean Carriers*, 251 B.R. at 49).  That is simply not the case here.  The Astros Entities and the Rockets Entities do not control the Debtor.  The Debtor has a four person board and two of those board members were appointed by Comcast.  It was that board, over the course of four separate meetings and upon advice of counsel, that unanimously approved the Debtor's pursuit of the Plan—not the teams.

37.     In addition, the Disclosure Statement describes a Plan that was negotiated at arm's length with AT&T and DTV, third parties that the teams do not control, following a robust marketing process.  And, the Plan is the only restructuring proposal made to the Board.  Indeed,

21

the thoroughness of the marketing process was critical to the board of directors' unanimous vote in favor of filing the Plan on July 31, 2014.  *See* Resolutions Adopted by the Board of Directors of Houston Regional Sports Network, LLC dated July 31, 2014 (noting that the board of directors "carefully considered and discussed…the lack of any other plans having been presented to the Board that are in a form that would be confirmable by the Bankruptcy Court").

38.     Next, Comcast claims that the Plan is facially flawed because it was not the result of an auction and provides for the Debtor to be purchased for "a mere $1,000."  Not true.  As set forth in the Disclosure Statement, the Astros Entities and the Rockets Entities each led multi-week marketing efforts pursuant to the Negotiations Order and the Amended Negotiations Order.  *See* Disclosure Statement, § V.D-E.  During this four month period, the Astros Entities and the Rockets Entities pursued potential restructuring transactions with numerous third parties, including the potential sale of the Debtor's business.  *Id*.  In addition, the Rockets Entities pursued negotiations with the Comcast Entities regarding a potential bid for the Debtor's business.  *Id*.  Despite their efforts, the Astros Entities and the Rockets Entities were unable to procure an offer from any outside party or the Comcast Entities during this period.  *Id.*

39.     Further, after the order for relief was entered, and the "lead negotiator" process concluded, Comcast abruptly stated that it would not buy the Network.

40.     After Comcast's announcement, the Astros Entities and Rockets Entities reinitiated their efforts to explore the market for alternative solutions.  Due to these extensive efforts (and with the support of the Debtor's counsel), and after significant negotiations, the teams reached an agreement in principle with AT&T and DTV on the framework of a transaction, which ultimately became embodied in the Plan.  The result of this transaction will transform the Debtor into a viable business by resolving the Debtor's inability to obtain carriage and generate revenue sufficient to meet its expenses.  This result was not achieved by a mere $1,000 purchase price, but rather by substantial contributions and sacrifices by the Astros

22

Entities, the Rockets Entities, AT&T and DTV; all without any assistance from Comcast.

Specifically, the Plan provides for:

- AT&T to enter into the AT&T Affiliation Agreement and DTV to enter into the DTV Affiliation Agreement, which will triple the Debtor's projected revenue;

- Astros LLC to enter into the New Astros Media Rights Agreement with material economic concessions, including reduced annual payment escalators and additional termination rights for the Reorganized Debtor upon an increase in media rights fees in connection with certain payment reset provisions;

- Rocket Ball to enter into the New Rockets Media Rights Agreement with material economic concessions, including reduced annual payment escalators and additional termination rights for the Reorganized Debtor upon an increase in media rights fees in connection with certain payment reset provisions;

- The Astros Entities' agreement to not require payment in full in Cash on the Effective Date of their approximately $58.75 million in principal amount in Administrative and Priority Claims;

- The Rockets Entities' agreement to not require payment in full in Cash on the Effective Date of their approximately $46 million in principal amount in Administrative and Priority Claims;

- Payment by the Rockets Entities and the Astros Entities of $10 million to $15 million in other Administrative Claims and Priority Claims; and

- AT&T and DTV capitalizing the Reorganized Debtor with $50 million in Cash on the Effective Date.

41.     Moreover, there is nothing in the Bankruptcy Code or the Plan preventing a third party or parties—including the Comcast Entities—from submitting an offer for the Debtor's business now.[7]

## IV.     SUBORDINATION OF THE MCLANE INDEMNIFICATION CLAIMS IS REQUIRED BY SECTION 510(b) OF THE BANKRUPTCY CODE

42.     The Proponents believe that the McLane Indemnification Claims are subordinated as matter of law under section 510(b) of the Bankruptcy Code.  The McLane Defendants are

---

[7] While it is true that the proposed Plan contains a $3.5 million break-up fee that becomes due and owing in certain circumstances, that fee is to be paid, if triggered, solely by certain of the Astros Entities and the Rocket Entities, not the Debtor or an alternate purchaser, and the Debtor has a fiduciary out that authorizes it to terminate the Investment Agreement if it receives a higher or better offer.  As such, the break-up fee poses no barrier to any outside party that wishes to submit an offer for the Debtor's business.

being sued in connection with the sale by the McLane Defendants of certain equity interests in the Debtor to the current owners of the Astros Entities.   The McLane Defendants have filed proofs of claim against the Debtor, asserting that they are entitled to indemnification from the Debtor on account of the lawsuit.

43.    Section 510(b) provides that:

[f]or the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, *or for reimbursement or contribution allowed under section 502 on account of such a claim*, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).

44.    The Fifth Circuit, along with the courts in other circuits, has broadly interpreted section 510.  *See SeaQuest Diving, L.P. v. S&J Diving, Inc. (In re SeaQuest Diving, LP)*, 579 F.3d 411, 421 (5th Cir. 2009) (recognizing that the Second, Third, Tenth and Ninth Circuits have adopted a similar interpretation of section 510(b)).  Courts have also held that claims seeking indemnification for damages arising from the purchase or sale of a debtor's securities may be subordinated under section 510(b).  *See In re Touch Am. Holdings, Inc.*, 381 B.R. 95, 103 (Bankr. D. Del. 2008 ("The plain language of this section is broad enough to include indemnification claims for both liabilities and expenses incurred on account of a claim for 'damages arising from the purchase or sale' of the debtor's or its affiliate's securities.");  *In re Mid-Am. Waste Sys., Inc.*, 228 B.R. 816, 824 (Bank. D. Del. 1999) (holding that the plain language and legislative history of section 510(b) show that it "intends to subordinate the indemnification claims of officers, directors, and underwriters for both liability and expenses incurred in connection with the pursuit of [securityholders'] claims for rescission or damages");  *In re De Laurentiis Entmn't Grp., Inc.*, 124 B.R. 305, 308 (C.D. Cal. 1991 ("[R]eimbursement by definition includes indemnification.").

24

45.     The equity interests sold by the McLane Defendants constitute "security[ies] of the debtor" for purposes of section 510(b).  Because the McLane Indemnification Claim is a claim for indemnification relating to the 2011 sale of "securit[ies] of the [D]ebtor," the McLane Indemnification Claim may be subordinated and has therefore been placed in Class 6— Subordinated Claims.

## V.     THE EXCULPATIONS ARE APPROPRIATE AND LAWFUL

46.     Section 14.3 of the Plan provides that the Reorganized Debtor, Debtor, Astros Entities, Rockets Entities, AT&T, DTV, and certain of their affiliates and personnel (including the current and former directors of the Network appointed by the Astros Partner and Rockets Partner, but not the Comcast Partner) will be exculpated for certain claims arising out of their actions during the Chapter 11 Case.  Although the Fifth Circuit has limited the ability of bankruptcy courts to approve non-consensual third-party claims against non-debtors, *see In re Pac. Lumber Co.*, 584 F.3d at 252, some courts have concluded that there is not an absolute prohibition and that third-party exculpations may be appropriate in certain circumstances.

47.     In *In re Texas Rangers Baseball Partners*, Judge D. Michael Lynn entered certain findings of fact and conclusions of law with respect to a confirmation order that approved exculpations for the purchaser of substantially all of the debtor's assets.  No. 10-43400-dml-11, 2010 WL 4106713, at *11 (Bankr. N.D. Tex. Oct. 12, 2010).  Judge Lynn concluded that:

> "The Plan's exculpation provision is consistent with the Fifth Circuit Court of Appeals' holding in [*Pacific Lumber*] in that it merely provides that neither the Debtor, the Post-Effective Date Debtor, Baseball Express [i.e., the purchaser of substantially all of the debtor's assets], nor the Creditors' Committee (and its members) shall be liable for actions taken since Commencement Date in connection with the Chapter 11 Case.  [The exculpation provision] does not violate section 524 or 1123 of the Bankruptcy Code and is within the confines of the Bankruptcy Code and Fifth Circuit Court of Appeals precedent and is thus approved." *Id.*

48.     Earlier, at the confirmation hearing, Judge Stacey G.C. Jernigan, sitting in for Judge Lynn, asked why the plan's exculpation provision should exculpate the purchaser,

LOS ANGELES 1086959 (2K)

Baseball Express.  The debtor's counsel explained that Baseball Express should be exculpated because of its financial contributions to the bankruptcy case (which would be used to satisfy all of the claims against the estate) and its assumption of over $200 million in existing liabilities.  *In re Texas Rangers Baseball Partners*, Aug. 5, 2010 Hr'g Tr. 75:20-25.  Additionally, counsel for Baseball Express emphasized that Baseball Express did not have any connection to the estate other than the acquisition of the debtor's assets and it did not engage in any acts during the chapter 11 process that would justify excluding it from exculpation.  *Id*. at 77:4-7.  Ultimately, the bankruptcy court indicated that it would approve the exculpation since, among other reasons, Baseball Express gave "significant consideration," the exculpation pertained to "postpetition activity and . . . [the exculpation clause has] a carve-out for gross negligence or willful misconduct."  *Id*. at 77:24-25, 78:1-2.  The grounds for exculpating Baseball Express in *In re Texas Rangers Baseball Partners* are also applicable to the proposed exculpations in favor of AT&T and DTV.

49.     Additionally, in *In re Ondova Ltd.*, Judge Jernigan entered findings of fact and conclusions of law with respect to a confirmation order which approved what were akin to third-party releases and exculpation clauses.  No. 09-34784-SGJ-11, 2012 WL 5879147, at *13 (Bankr. N.D. Tex. Nov. 21, 2012).  That bankruptcy court there explained that the releases were "more in the nature of compromises and settlements that may occur in a plan pursuant to Section 1123(b)(3)(A)," and that such releases may be appropriate in a case with extremely unusual circumstances and broad and complex compromises.  *Id*.

50.     This Chapter 11 Case is likewise unusual.  Permitting the Rockets Entities, Astros Entities, AT&T, and DTV to be exposed to claims would be highly problematic.  The Rockets Entities and Astros Entities are obligated to provide services to the Network post-Effective Date by and through the New Media Rights Agreements and they are also obligated to backstop distributions to certain creditors of the Network.  AT&T and DTV will be equity owners of the

26

Reorganized Debtor and intimately involved with (and controlling) its operations.  Exculpations in favor of these parties are consequently appropriate and lawful.  *Cf. Feld v. Zale Corp.* (*In re Zale Corp.*), 62 F.3d 746, 761 (5th Cir. 1995) (noting that "unusual circumstances" exist "when the non-debtor and debtor enjoy such an identity of interest that the suit against the non-debtor is essentially a suit against the debtor," "when the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization," and when the exculpation  is part of a settlement that provides "substantial consideration" to the estate and constitutes a "key provision" of the plan).

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein, the Proponents respectfully request that this Court: (a) overrule the Objections; (b) enter the Solicitation Order; and (c) grant such other and further relief as the Court deems just and proper.

Dated:  September 3, 2014
      Houston, Texas

HAYNES AND BOONE, LLP

By:   /s/ Charles A. Beckham, Jr.
       Charles A. Beckham, Jr.
       Texas Bar No. 02016600
       Henry Flores
       Texas Bar No. 00784062
       Christopher L. Castillo
       Texas Bar No. 24065022
       1221 McKinney Street, Suite 2100
       Houston, Texas 77010
       Telephone:   (713) 547-2000
       Facsimile:   (713) 547-2600

*Counsel to Debtor and Debtor in Possession*

MITHOFF LAW FIRM
Richard Warren Mithoff
Sherie Potts Beckman
One Allen Center, Penthouse
500 Dallas Street
Houston, Texas  77002-4800
Telephone:      (713) 654-1122
Facsimile: (713) 739-8085

WHITE & CASE LLP
Alan Shore Gover
Ian J. Silverbrand (admitted *pro hac vice*)
1155 Avenue of the Americas
New York, New York  10036-2787
Telephone:      (212) 819-8200
Facsimile:      (212) 354-8113

Roberto J. Kampfner (admitted *pro hac vice*)
633 West Fifth Street, Suite 1900
Los Angeles, California  90071-2007
Telephone:      (213) 620-7700
Facsimile:      (213) 452-2329

*Counsel for Rocket Ball, Ltd.*

VINSON & ELKINS LLP
Harry A. Perrin
Duston K. McFaul
1001 Fannin Suite 2500
Houston, Texas 77002
Telephone:      (713) 758-2548
Facsimile: (713) 615-5016

KIRKLAND & ELLIS LLP
Paul M. Basta, P.C. (admitted *pro hac vice*)
David S. Meyer (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900

Jeffrey S. Powell (admitted *pro hac vice*)
Judson D. Brown (admitted *pro hac vice*)
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:   (202) 879-5000
Facsimile:   (202) 879-5200

*Counsel for Houston Astros, LLC*

28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 3, 2014, true and correct copies of the foregoing were served via email upon the parties that receive electronic notice in this case pursuant to the Courts' ECF filing system.

*/s/ Charles A. Beckham, Jr.*
Charles A. Beckham, Jr.